SCHOTTKY, J.
Loretta Putman Dodge Welsh, as the administratrix of the estate of George Raymond McConnell, appeals from a judgment in favor of Glenn Griffin, individually, and as the administrator of the estate of Catherine Griffin, deceased. By the action Loretta Welsh sought an accounting of the rents and profits from and the reconveyance of certain real property allegedly belonging to George McConnell. Glenn Griffin cross-complained to quiet title to the property and judgment was given in his favor on the cross-complaint.
By the terms of her will Bridget Graham, who died in 1923, devised to her son, George McConnell (hereinafter referred to as George) a 6/25th interest in a ranch and to her daughter, Catherine McConnell Griffin (hereinafter referred *210 to as Kate) a 7/25th interest. The remainder was devised to other persons, including her daughter, Mary Ann Putman.
In 1931 it became necessary to refinance the mortgage on the property. George transferred his interest in the property to Kate in order to facilitate this, and the other heirs transferred their interest to Mary Ann Putman for the same purpose. At the time George deeded his interest to Kate, he and Kate executed a second instrument by which George retained a reversionary interest in the property and an interest in the net income from the property.[1] Kate thereafter was the owner *211 of record of George’s interest. In 1932 the mortgage was foreclosed. Kate and Mary Ann Putman purchased the property at the foreclosure sale. In 1936 the property was partitioned and Kate received 13/25ths as her share. She farmed or leased the property, improved it, paid the taxes and made payments on the mortgage. She never made the annual accountings and settlements for net profits required by the agreement, nor does the record disclose that George ever demanded an accounting prior to 1951. Kate gave money to George whenever he wanted. He apparently was a man of simple tastes who demanded little of life. Prom the record it is clear that George wanted no part of the struggle to keep the ranch. He was extremely fond of his sister, Kate, and left the financial affairs of the ranch to her. He often said, “Anything that comes off that ranch I want my sister to have it.”
About July 9, 1951, George was hospitalized in the Woodland Clinic at Woodland. His illness was diagnosed as lymphosarcoma. Before he entered the hospital he discussed his illness and his need of money with Kate’s son, Glenn, who advanced him several thousand dollars. At this time there was some discussion of George selling his interest in the ranch and there was testimony that Glenn offered to pay $60,000 therefor.
According to Virgil O’Sullivan, one of appellant’s counsel and the son of Eulalia O ’Sullivan, a niece and heir of George, George came to see him at his office on July 9, 1951. As a result of the discussion O’Sullivan obtained the agreement from the office of the attorney who drafted it. Mr. O ’Sullivan testified that on August 2,1951, he, acting on behalf of George, *212 made a démand for an accounting on Neil J. Cooney, an attorney who had represented Kate and her son in other matters. He testified that Glenn Griffin was present at the time. This was denied by Glenn. Cooney was never called as a witness.
In 1938 at a time when Kate was very ill she transferred the property to her son by a quitclaim deed, and in 1951, after George’s death, she transferred the property to her son by grant deed.
On April 8, 1952, this action was commenced. The second amended complaint set forth three causes of action. The first cause of action alleged that there was a breach of duty to account and that the defendants Catherine McConnell Griffin and Glenn Griffin had no intention of performing their obligations under the trust. The second cause alleged that George transferred the property to Kate upon the condition that she would perform her obligations under the trust and that she had not performed them; that there was a breach of duty to account. The third cause alleged that Kate had induced George to enter into the agreement with the fraudulent intent and purpose of obtaining title to the property and with the intent not to comply with the agreement, and that she never paid George the rents and profits or rendered him an accounting. A fourth cause of action was added by an amendment which alleged that Kate breached the trust when she executed the deed to her son in 1938 and that he became an involuntary trustee. The relief sought was an accounting of the rents and profits; a decree that Glenn Griffin held part of the property in trust; a decree requiring Glenn Griffin to convey to plaintiff her intestate’s interest in the property; and a cancellation of the trust indenture.
The answer alleged in part that George had never sought an accounting; that his interest had been terminated by the deed to Kate; that his interest had been terminated by the foreclosure action; that no trust existed; that George’s interest had been terminated by the partition action; and that plaintiff was estopped to bring the action. A cross-complaint asked that the court quiet title in Glenn Griffin.
The trial court found in part that no accounting was ever made to George; that no accounting was ever demanded; that Geoi’ge and Kate agreed during George’s lifetime that no accounting need be rendered; that no demand was ever made upon Glenn during George’s lifetime; that Cooney upon whom the demand was made did not have authority to act in the mat *213 ter and that the demand upon Cooney was not a demand upon Kate; that when the agreement was made between Kate and George he had the independent legal advice of the attorney who prepared the instrument; that neither Kate nor her son violated the trust and confidence reposed in her by George; that there was no fraud or fraudulent inducement in the transaction ; that it was not true that Kate did not intend to carry out the agreement at the time she entered into it; that the quitclaim deed was not in breach of the agreement; and that during his lifetime George received all the income to which he was entitled.
 Appellant first contends that the trial court decided the case on theories not raised by the pleadings. Appellant argues that the only legal theory upon which the judgment in favor of respondents could have been predicated was that the instrument did not create a trust and that Kate therefore never became obligated to act as a trustee. There was no dispute as to the execution of the so-called trust agreement. The fact that the respondents denied that a trust existed did not preclude evidence of performance of the obligations under the agreement except insofar as they may have been waived. If there was a trust and George waived his rights to an accounting, then by the terms of the agreement, since George predeceased Kate, his interest in the land would have terminated prior to the commencement of the action, and it would have been proper for the trial court to quiet title in Glenn.
It is clear from the facts herein and applicable law that when Kate accepted George’s transfer and executed the concurrent contract she assumed the obligations of a trustee in respect to her handling of the property, her duty to account, and the protection by her of George’s interest.
We think it is clear from the record that it was understood by the parties that the issue before the court was the effect of the trust agreement and that appellant was claiming that a trust had been created, that Kate violated the agreement, and that the property should be returned to George’s estate. It is also clear that respondents contended that an accounting had been waived and that there had been no violation of the agreement. “ The basic purpose of our legal system is to do justice between the parties under established legal principles. The trial judge should be more than an umpire. . . . If he reaches the conclusion from the evidence that an attorney for one party has misconceived the basic rights of his client *214 under the facts which he finds to be true he has not only the right, but the duty, to decide the case in accordance with such findings. All that fairness requires is that the new theory, which the judge decides is the correct one, be disclosed to the opposing party so that he may have a full opportunity to meet it. . . .” (Sand v. Concrete Service Co., 176 Cal.App.2d 169, 172 [1 Cal.Rptr. 257].) The rule is applicable here.
Appellant also argues that the finding of the trial court that George waived an accounting is not supported by the evidence because such an agreement is clearly within the statute of frauds and there is no evidence that there was a written waiver. No authority is cited for the contention. It is stated in 54 American Jurisprudence, Trusts, section 335, that ‘‘The approval or consent by a beneficiary, within the rule of estoppel, waiver, or preclusion as to his right to object to an improper act, omission, or transaction in the administration of a trust, may be oral or, a fortiori, in writing, and it may be express or inferred from language or conduct. ...” We find nothing in the statute of frauds which compels a conclusion that a waiver of an accounting must be in writing. The thirteenth and fourteenth affirmative defenses alleged that George never made a demand for an accounting. The agreement was in effect some 20 years. It is a fair inference that George knew that Kate was not rendering an accounting to him and that if he had desired one he would have asked for it. However, George’s failure to demand an accounting would not mean that he would not have been entitled to an ultimate accounting, for as stated in 4 Bogert on Trusts, section 964, at page 250, “But a consent to a delay in accounting is not a waiver of the right to an ultimate account.”
 Appellant also contends that it was improper for the court to find that Kate fully carried out her obligations as a trustee when the fact of performance was not pleaded. The third cause of action alleged that Kate had no intention of performing her obligation under the agreement. This was denied. The fact of performance was relevant on the issue of fraudulent intent and the finding was proper.
Appellant also contends that the court erroneously concluded that George was guilty of laches and was estopped to bring an action for an accounting and therefore appellant was estopped. This finding was erroneous because there is no evidence in the record from which it can be inferred that there was a change of position by Kate which would permit the invocation of the doctrine of estoppel.
*215 Appellant also contends that by the continued violations of her obligations Kate repudiated the trust and that as a result she became an involuntary trustee of the trust. “Whether a given act is consistent with the continuance of the trust, or indicates an intent to repudiate the trust and claim adversely, is a question of fact for the determination of the court in each individual case....” (4 Bogert on Trusts, § 951, p. 205.) In the instant case Kate’s bidding in the property in her own name at the foreclosure sale and asserting in the partition action that she owned 13/25ths of the property was consistent with the very terms of the agreement. The quitclaim deed in 1938 to her son was not inconsistent with the terms of the trust. While the failure to keep proper accounts and the failure to keep the trust funds separate would be evidence from which a finding of repudiation of the trust could be sustained, it would not compel such a finding. If the delegation of her duties to her son was improper, Kate would be liable to George for any damage caused by the delegation, but the mere delegation of the duties would not compel a conclusion that she repudiated the trust. The question was one of fact for the trial court to determine, and the conclusion that Kate did not repudiate the trust is supported by the record.
Except as to the finding on the issue of an estoppel to seek an accounting, the finding as to a waiver of an ultimate accounting, and the finding that there had been no accumulation of net income belonging to George, the judgment is supported by the record. The judgment is reversed insofar as it denies an accounting of the rents and profits of the real property in controversy during George’s lifetime. The trial court is instructed to order an accounting to ascertain if Kate held at George’s death any assets which were due George as his share of the net income from the property which was earned during the period of the trusteeship.
Van Dyke, P. J., and Peek, J., concurred.
A petition for a rehearing was denied April 22, 1960, and appellant’s petition for a hearing by the Supreme Court was denied May 20, 1960. Dooling, J. pro tem.,* participated therein in place of Spence, J. Peters, J., was of the opinion that the petition should be granted.

"That, Whereas, the party of the second part has this day made his deed to the party of the first part conveying to her all his six twenty-fifths (6/25ths) interest in the land situated in the County of Colusa, known as the Bridget Graham ranch or land, in said deed particularly described:
"And, Whereas, it was and is intended by said deed to convey the title of the party of the second part in and to said interest in said land to the party of the first part, absolutely, . . . in order that said land may be more conveniently and profitably managed and handled, . . .;
"And, Whereas, the whole interest in said land is subject to a mortgage made to J. W. Browning to secure a loan of $35,000.00 made by Catherine McConnell Griffin, as the executrix of the last will of said Bridget Graham, deceased, . . ., while said land constituted a part of the estate of Bridget Graham, . . .; and which loan and mortgage remain unpaid and is now due and owing.
"And, Whereas, it will he necessary in the immediate future for the co-owners of said land to execute a new note and mortgage or deed of trust to secure said indebtedness;
"And, Whereas, a partition of said land may hereafter be made among the co-owners according to their respective rights;
"Now, Therefore, It Is Agreed between the parties hereto that the execution of said deed is intended to- vest the title and interest of the party of the second part in and to said land in the party of the first part as her own with absolute power of disposition and with express power to sell or join in a partition of said land among the co-owners and to sell, convey, mortgage, or hypothecate the same as security for the indebtedness owing, or that may hereafter be incurred or join with the other co-owners in the execution of any mortgage or deed of trust for the purpose of securing of any such indebtedness owing, and generally to hold, manage and deal with the same in all respects as her own.
"In Consideration Whereof, the party of the first part agrees to account to and pay the party of the second part annually during his lifetime, during the time she may continue to hold said interest in said land conveyed to her by him for that portion of the net share of the income from said land received by her that his share in the land conveyed by him to her bears to the total interest in said land, to wit, 6/2oths of the total net income; it being understood that she shall not however, be required to account for or pay income from said land any amount in excess of that actually received by her; and by "net income” is intended to mean the net profits after paying all expenses connected with the farming of said land payable by the owners, taxes and interest on any indebtedness by the owners or secured to he paid as a lien or charge on said land.

I (

"In Case the land is partitioned either by agreement or court decree
*211 so that the share of the party of the first part, to wit, 7/25ths and the 6/25ths interest therein so conveyed to her by the party of the second part are together set apart to the party of the first part in a separate parcel representing 13/25ths of the whole, the share of the net income from such separate parcel so set apart to her for which she will thereafter account to the party of the second part as aforesaid, will, in that case be 6/13ths of the same.
“It Is Further Understood and Agreed that in ease the party of the second part survives the party of the first part that title to said share or interest in said land so conveyed by him to her as aforesaid (if remaining unsold) shall re-vest absolutely in the party of the second part upon the death of the party of the first part, but in case the party of the first part shall survive the party of the second part, then all right, title and interest of the party of the second part in or to said lands or premises or proceeds of the sale thereof or to the income thereafter therefrom shall cease and terminate on his death and the right, title and interest of the party of the first part in the interest or share so conveyed to her to the income therefrom thereafter shall be vested in her absolutely and unconditionally. ’ ’

 Assigned by Chairman oí Judicial Council.